## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re:*

*Application of The Reporters Committee for Freedom of the Press and The Washington Post for an Order Further Unsealing the Orders, Briefs, Transcripts, Docket, Record, and Party Names in In re Grand Jury Subpoena No. 7409.*

Miscellaneous Action No. _____

**Oral Argument Requested**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE WASHINGTON POST FOR AN ORDER FURTHER UNSEALING THE ORDERS, BRIEFS, TRANSCRIPTS, DOCKET, RECORD, AND PARTY NAMES IN *IN RE GRAND JURY SUBPOENA NO. 7409*

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The Reporters Committee has a longstanding interest, demonstrated throughout its more than fifty-year existence, in advocating for government transparency, including for the rights of the press and public to access court records and proceedings.

WP Company, LLC, d/b/a The Washington Post (the "Post") is a news organization based in Washington, D.C.  The Post publishes the leading daily newspaper, by print circulation, in the nation's capital, as well as on the website www.washingtonpost.com.  Since 1936, the Post has won 76 Pulitzer Prizes.  As the paper of record for the nation's capital, the Post, like the Reporters Committee, has a longstanding interest in advocating for government transparency, including for the rights of the press and public to access court records and proceedings.  The Post extensively covered the Trump administration and the Special Counsel's investigation into foreign interference in the 2016 presidential election, and it is actively covering the current reelection campaign of former President Donald J. Trump.

Pursuant to Local Criminal Rule 57.6, the Reporters Committee and the Post hereby petition this Court for an order authorizing the further unsealing of the orders, briefs, transcripts, docket, record, and party names in the case captioned *In re Grand Jury Subpoena No. 7409*.

## PRELIMINARY STATEMENT

This application pertains to a closed matter concerning the efforts of a once-secret 'mystery witness' to resist compliance with a subpoena issued in connection with one of the most consequential government investigations in American history.  In January and February 2019, the Reporters Committee filed motions in the Supreme Court, the D.C. Circuit, and this Court seeking orders directing the filing of redacted, public versions of the briefs, record, transcripts, and orders in *In re Grand Jury Subpoena No. 7409*, and its attendant appeals.  At that time, the public generally understood the matter to be a fight about whether a corporation owned by a foreign country—referred to in public filings as a "Corporation from Country A"—needed to comply with a grand jury subpoena.  The public also understood that the legal battle between the subpoenaed corporation and the government was linked to then-Special Counsel Robert S. Mueller's investigation of foreign interference in the 2016 presidential election.  But sealing of almost the entire record to protect the then-ongoing grand jury proceeding and underlying criminal investigation sharply limited the public's understanding.

Over time, additional details about this subpoena fight and the underlying investigation have come to light.  Five years ago, after the Reporters Committee sought—and partially obtained—the unsealing of certain documents filed in the D.C. Circuit and Supreme Court, this Court granted in part and denied in part the Reporters Committee's motion to unseal certain documents after *sua sponte* unsealing certain others in redacted form.  Just over two months ago, the Court removed additional redactions from documents responsive to the Reporters Committee's 2019 motion.  And only a few weeks ago, the Post published a meticulously reported story about the investigation underlying this contempt proceeding and the once-secret witness that became the mystery contemnor.  *See* Ex. 1 (Aaron C. Davis & Carol D. Leonnig, *$10M Cash Withdrawal*

*Drove Secret Probe into Whether Trump Took Money from Egypt*, Wash. Post (Aug. 2, 2024),

https://www.washingtonpost.com/investigations/2024/08/02/trump-campaign-egypt-

investigation/ ("Davis & Leonnig")); *see also* Ex. 2 (Carol D. Leonnig & Aaron C. Davis, *House*

*Democrats Ask Trump If He Illegally Accepted $10 Million From Egypt*, Wash. Post (Sept. 3,

2024), https://www.washingtonpost.com/investigations/2024/09/03/trump-egypt-investigation-

menendez/ ("Leonnig & Davis")).[1]

When the Reporters Committee last appeared before this Court in connection with *In re*

*Grand Jury Subpoena No. 7409* in 2019, Judge Howell explained that any unsealing had to be

limited because the investigation that had prompted the subpoena was not only ongoing but was,

as confirmed by a Justice Department attorney, "continuing robustly." Hr'g Tr. at 10:18-12:1,

17:6-13 (Mar. 27, 2019), ECF No. 113 ("Hr'g Tr.").[2] At the time, the investigation had been

transferred from the Special Counsel to the United States Attorney's Office for the District of

Columbia. But, as the Post has reported, that investigation ultimately ended in June 2020. And

the Post's reporting, which is based on dozens of interviews and a review of thousands of pages

of documents, has shed considerable new light on—and raised new questions about—that

investigation.[3] Among other things, the public now knows that the investigation was looking into

---

[1] Citations to "Ex. __" refer to exhibits to the accompanying Declaration of Lee R. Crain in Support of the Application of the Reporters Committee for Freedom of the Press and The Washington Post for an Order Further Unsealing the Orders, Briefs, Transcripts, Docket, Record, and Party Names in *In re Grand Jury Subpoena No. 7409*.

[2] Unless otherwise indicated, citations to ECF documents reference filings and orders on the docket for the proceeding *In re Grand Jury Subpoena No. 7409*, No. 1:18-gj-0041-BAH (D.D.C.).

[3] Several details in the Post's August 2024 reporting on the Egypt investigation were also reported by *The New York Times*, in an article published after the Post's. *See* Ex. 3 (Michael S. Schmidt, Adam Goldman & Glenn Thrush, *Alongside the Trump-Russia Inquiry, a Lesser-Known Look at Egyptian Influence*, N.Y. Times (Aug. 2, 2024),

reports "that Egyptian President Abdel Fatah El-Sisi sought to give [former President Donald J.] Trump $10 million to boost his 2016 presidential campaign," and whether "money from Sisi might have factored into Trump's decision in the final days of his run for the White House to inject his campaign with $10 million of his own money." Ex. 1 (Davis & Leonnig) at 1. The article further details how, "[o]ver the course of his presidency, Trump shifted U.S. policy in ways that benefited the Egyptian leader." *Id.* at 3. The article also includes statements by a spokesperson for the Egyptian government, a spokesperson for Trump, and the former prosecutor who closed the investigation in 2020, all confirming the investigation. *Id.* at 2–3.

The Post's reporting raises grave questions about not only the conduct that was being investigated—the possibility that a foreign government made an illegal $10 million campaign contribution to a U.S. presidential candidate—but also about why the investigation was closed under the prior administration, why it remained dormant under the current one, and what might have been found had it continued. *See id.* at 10 (describing "[f]rustrated investigators" who argued to the prosecutor overseeing the investigation that "in any other case – even with far less compelling evidence – they would have been able to obtain additional bank records"); *id.* at 12 (noting that, "[i]n an interview with The Post," the Department of Justice official who closed the investigation "said Biden appointees . . . could have relaunched the probe if they disagreed" with his decision).

Consistent with this Court's prior ruling, additional material should now be unredacted. The grand jury proceeding that gave rise to this contempt case and the underlying investigation have ended. As a result, the heightened concerns this Court cited that arise in the context of an

---

https://www.nytimes.com/2024/08/02/us/politics/trump-mueller-egypt.html ("Schmidt, Goldman & Thrush")).

ongoing grand jury proceeding or investigation are no longer present.  Relatedly, any residual secrecy concerns should give way because substantial information regarding *In re Grand Jury Subpoena No. 7409*, the grand jury proceeding that spurred it, and the government's underlying investigation have become publicly known due to reporting by the Post (and other news outlets). That includes, among many other things, the identity of the contemnor corporation and its parent country as well as confirmation of the investigation and its closure by the relevant parties.  These "disclosure[s], coupled with the [Post's and others'] extensive reporting about th[is] dispute[], makes it possible"—indeed probable—"that the underlying . . . dispute[], or at least the aspects of [it] that have been publicly disclosed, are so widely known that they are no longer protected by Rule 6(e)." *In re Cheney*, 2024 WL 1739096, at *4 (D.C. Cir. Apr. 23, 2024) (per curiam); *see also In re Motions of Dow Jones & Co.*, 142 F.3d 496, 505 (D.C. Cir. 1998) (explaining that the identity of a subpoenaed witness can lose its character as 6(e) material if an attorney "proclaim[s] from the rooftops that his client ha[s] been subpoenaed to testify").

The Post's reporting also raises pressing questions about the government's investigation that are of the utmost public concern—again militating in favor of increased disclosure.  At present, the public has little choice but to simply accept that the investigation was ended, and little ability to assess the government's handling of that investigation.  "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). Public disclosure is one powerful antidote to that democratic difficulty.  Indeed, "public access . . . is one of the numerous checks and balances of our system." *Id.* at 592 (Brennan, J., concurring) (quotation marks omitted).  It permits the public to serve as a check on governmental action by performing its role "as overseer of the criminal justice process." *Washington Post v. Robinson*,

935 F.2d 282, 287 (D.C. Cir. 1991); *see Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (reiterating that public access "serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally" (quoting *United States v. Hubbard*, 650 F.2d 293, 315 (D.C. Cir. 1980))). And it "enhances . . . the appearance of fairness so essential to public confidence in the system." *Robinson*, 935 F.3d at 288 (quoting *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Oregon*, 920 F.2d 1462, 1465 (9th Cir. 1990)); *see In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1123 (D.C. Cir. 2020) (explaining public access "is a fundamental element of the rule of law"); *see also Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 604–05 (1982) (explaining the First Amendment right of access can help "ensure that [the public's] constitutionally protected 'discussion of governmental affairs' is an informed one"). Thus, by further unsealing court records, this Court will promote two of the most fundamental benefits of press and public access: governmental accountability and public confidence in our institutions.

The Reporters Committee and the Post therefore respectfully request that the Court issue an order further unsealing the orders, briefs, transcripts, docket, record, and party name(s) in this proceeding. Specifically, the Court should unseal all previously redacted information pertaining to the Egypt investigation undertaken by the Special Counsel and later transferred to the U.S. Attorney's Office for the District of Columbia. At a minimum, the Court, in conjunction with the government and the contemnor's counsel, Alston & Bird LLP, should remove redactions that conceal (1) the name of the contemnor, (2) any material that was redacted to shield the identity of the contemnor corporation and its foreign country owner, and (3) any material redacted to conceal the existence and nature of the government's underlying investigation.

# RELEVANT BACKGROUND

**A.       The Special Counsel's investigation and this grand jury contempt matter.**

In the wake of the 2016 presidential election, media reports drew attention to apparently unprecedented efforts by foreign governments to influence the outcome of the election. *See, e.g.,* Ex. 4 (*What We Know – and Don't Know – About the Trump Team's Contacts with Russia Before the Election*, ABC News (Feb. 15, 2017), https://abcnews.go.com/Politics/trump-teams-contacts-russia-election/story?id=45508470).    Then, in May 2017, Deputy Attorney General Rod Rosenstein appointed Robert Mueller to serve as Special Counsel for the Department of Justice. *In re Grand Jury Investigation*, 916 F.3d 1047, 1051 (D.C. Cir. 2019).  Deputy Attorney General Rosenstein authorized Special Counsel Mueller to investigate foreign governmental efforts, ostensibly by Russia, to interfere in the 2016 presidential election and related matters, and to prosecute any federal crimes uncovered during the investigation. *Id.*

But as reporting by the Post and other news organizations has now made clear, the Special Counsel's investigation was not limited to potential interference by Russia—as the public once widely believed.  One of the matters the Special Counsel oversaw related to a possible payment of approximately $10 million from a state-owned Egyptian bank to former President Trump either during his candidacy or after he was elected. Ex. 1 (Davis & Leonnig) at 1; Ex. 5 (Katelyn Polantz, Evan Perez & Jeremy Herb, *Exclusive: Feds Chased Suspected Foreign Link to Trump's 2016 Campaign Cash for Three Years*, CNN (Oct. 14, 2020), https://www.cnn.com/2020/10/14/politics/trump-campaign-donation-investigation/index.html ("Polantz, Perez & Herb")) at 1.  Until recently, however, relatively little was known about this aspect of the Special Counsel's investigation.

Information about the Egypt investigation first began to emerge when the Special Counsel initiated contempt proceedings in this Court. *See, e.g.,* Ex. 6 (Darren Samuelsohn & Josh Gerstein,

7

*Reporters Shooed Away as Mystery Mueller Subpoena Fight Rages On*, Politico (Dec. 14, 2018), https://www.politico.com/story/2018/12/14/mystery-mueller-subpoena-fight-1065409); *see also In re Grand Jury Subpoena*, 749 F. App'x 1, 2 (D.C. Cir. 2018).  The Special Counsel sought to compel a then-unnamed corporation (referred to as the "Corporation") owned by a then-unnamed foreign sovereign (referred to as "Country A") to comply with a grand jury subpoena.  *In re Grand Jury Subpoena*, 749 F. App'x at 2.  The corporation resisted, invoking its owner's sovereign immunity; it ultimately lost, but not before raising its immunity argument in the D.C. Circuit and in the Supreme Court.  *See id.*; *see also, e.g.*, Judgment at 1, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Dec. 18, 2018), ECF No. 1764819; Petition for Writ of Certiorari, *In re Grand Jury Subpoena*, No. 18-948 (U.S. Jan. 7, 2019); Docket Entry Denying Petition, *id.* (U.S. Mar. 25, 2019).

As the mystery witness appealed the contempt order entered by this Court, the Reporters Committee filed motions to unseal in parallel.  On January 9, 2019, one day after the D.C. Circuit released in redacted form its opinion affirming this Court's contempt order, *see* Public Redacted Opinion, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Jan. 8, 2019), ECF No. 1767507, the Reporters Committee moved to unseal related records of the D.C. Circuit and the Supreme Court.  *See* Motion to Unseal, *In re Grand Jury Subpoena*, Nos. 18A669 & 18M93 (U.S. Jan. 9, 2019); Motion to Unseal, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Jan. 9, 2019), ECF No. 1767730.  The Reporters Committee's motion in the D.C. Circuit sought an order directing "that public, redacted versions of the briefs and record in th[e] appeal and a redacted oral argument transcript be filed," and "request[ed] that the government and the witness refrain from redacting this information in its unsealed filings."  *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Jan. 9, 2019), ECF No. 1767730 at 3; *id.*, ECF No. 1772302 at 2.  Similarly, the Reporters Committee

moved the Supreme Court "to direct the filing of publicly redacted version of the documents that ha[d] been filed[,]" and also asked that Court, "[i]n the event [it] grant[ed] certiorari," to "direct the filing of publicly redacted versions of all merits briefs, that any oral argument be held publicly, and that a redacted oral argument transcript and recording be publicly filed." Motion to Unseal, *In re Grand Jury Subpoena*, Nos. 18A669 & 18M93, at 1 (U.S. Jan. 9, 2019).

These efforts bore fruit. On February 1, 2019, the D.C. Circuit granted a separate motion, filed by the contemnor corporation, seeking leave to publicly file its sealed January 16, 2019 brief responding to the Reporters Committee's motion. *See* Order, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Feb. 1, 2019), ECF No. 1771648. Because that filing made the identity of its counsel public, the government recognized that its arguments against revealing the same information on the Supreme Court docket were moot, permitting that information to, again, be filed publicly. *See* Letter of Noel J. Francisco, U.S. Solicitor Gen., to Hon. Scott S. Harris, *In re Grand Jury Subpoena*, No. 18-948 (U.S. Feb. 4, 2019). Additionally, the D.C. Circuit ultimately granted the Reporters Committee's unsealing motion in part. Accordingly, it required the government to publicly file briefs, a transcript, and certain other documents in that appeal, while applying only the limited redactions still required because, for instance, "the grand jury investigation [was] ongoing." *See* Order at 1, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. June 7, 2019), ECF No. 1791658; *see also* Order, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Apr. 23, 2019), ECF No. 1784227.

On February 26, 2019, after the case returned to this Court, the Reporters Committee moved under Local Criminal Rule 6.1 for an order directing the filing of redacted, public versions of the briefs, record, transcripts, and orders filed in this Court. Mot. to Unseal at 1, ECF No. 94. Among other things, the Reporters Committee's motion explained that by that point "numerous

filings" from the above-noted appeals had been filed publicly, and that other information had been unsealed, but the identities of the corporation and "Country A" were still sealed. *Id.* at 6–8, 16.

On March 27, 2019, the Court held a hearing on the Reporters Committee's motion to unseal. At the hearing, counsel for the contemnor indicated that the corporation preferred its identity not be made public. Hr'g Tr. 5:18-6:3. The U.S. Attorney's Office for the District of Columbia—which by that point had taken over the Egypt investigation—represented that the grand jury investigation was "continuing robustly." *Id.* at 17:9. As a result, the Court explained it was obligated to "evaluate the Reporters Committee request for unsealing in the context of a robust and ongoing grand jury investigation." *Id.* at 17:11-13.

On April 1, 2019, the Court granted the Reporters Committee's motion in part. Order (Apr. 1, 2019), ECF No. 116. In its written order, the Court again noted the "[i]mportant[]" fact that the "underlying grand jury investigation is ongoing," and observed that "the need for secrecy is heightened during an *ongoing investigation* and warrants redactions to preserve grand jury secrecy." *Id.* (emphasis added). As a result, while the motion to unseal was granted in part, "any matters occurring before the jury" were to remain sealed; at the time, the Court also did not require the contemnor corporation's identity to be made public. *Id.* at 10, 11. Shortly thereafter, in an order unsealing certain information in response to the Reporters Committee's January 9 motion to unseal, the D.C. Circuit agreed that the corporation's identity need not be disclosed "unless and until [it] publicly disclosed its identity." Order at 2-3, *In re Grand Jury Subpoena*, No. 18-3071 (June 7, 2019), ECF No. 1791658.

A little over two months ago, on or around June 20, 2024, this Court released less-redacted versions of certain records it had previously directed be unsealed with redactions in 2019. These more lightly redacted materials shed additional light on the underlying grand jury investigation

and this contempt proceeding. Government Status Report (June 14, 2024), ECF No. 139. The further unsealed materials include the Court's memorandum opinion denying the corporation's motion to quash the subpoena and reveal, among other things, that the corporation's personnel are located in Cairo, Egypt. Mem. Op. (Sept. 19, 2018), ECF No. 139-1 at 4 & n.3, 31. They also show that at least as early as January 2019, the Court and the parties acknowledged that the connection between the Special Counsel investigation and *In re Grand Jury Subpoena No. 7409* was publicly known, and the Court acknowledged that its orders constraining the parties' from speaking publicly "must be limited," to address only the "limited measure of secrecy needed to ensure the fair administration of justice" and the "continuing requirement of grand jury secrecy." Mem. Op. (Jan. 15, 2019), ECF No. 139-1 at 35, 38.

**B.     Subsequent developments and the Post's reporting on the Egypt investigation.**

Since the Court's April 1, 2019 ruling, public information about Special Counsel Mueller's investigation has increased dramatically. Before the March 27, 2019 hearing on the Reporters Committee's motion to unseal, the Attorney General had issued only a four-page summary of what he called the "principal conclusions" reached by the Special Counsel. Ex. 7 (Letter from Attorney Gen. William P. Barr to Sen. Lindsey Graham, Rep. Jerrold Nadler, Sen. Dianne Feinstein, and Rep. Doug Collins (Mar. 24, 2019), https://www.washingtonpost.com/context/read-attorney-general-barr-s-principal-conclusions-of-the-mueller-report/218b8095-c5e3-4eab-9135-4170f5b3e87f/) at 1. A redacted version of the Mueller Report was first released on April 18, 2019. Ex. 8 (Shane Harris, Ellen Nakashima & Craig Timberg, *Through Email Leaks and Propaganda, Russians Sought to Elect Trump, Mueller Finds*, Wash. Post (Apr. 18, 2019), https://www.washingtonpost.com/politics/through-email-leaks-and-propaganda-russians-sought-to-elect-trump-mueller-finds/2019/04/18/109ddf74-571b-11e9-814f-e2f46684196e_story.html);

*see also* Ex. 9 (Attorney Gen. William P. Barr, Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (Apr. 18, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian).   And two more versions of the Mueller Report—with successively fewer redactions—were released by the Department of Justice on June 19 and November 2, 2020, respectively.   *See* Compl. ¶ 1, *Leopold v. U.S. Dep't of Justice*, No. 19-cv-957 (D.D.C. Apr. 4, 2019); Ex. 10 (Devlin Barrett, *Mueller's Team Contemplated Whether Trump Had Lied to Them, Newly Disclosed Sections of Report Show*, Wash. Post (June 19, 2020), https://www.washingtonpost.com/national-security/mueller-report-redactions-trump-roger-stone/2020/06/19/ff3a9c16-b283-11ea-856d-5054296735e5_story.html); Ex. 11 (Jason Leopold & Ken Bensinger, *New: Mueller Investigated Julian Assange, WikiLeaks, and Roger Stone for DNC Hacks*, Buzzfeed (Nov. 3, 2020), https://www.buzzfeednews.com/article/jasonleopold/new-mueller-investigated-julian-assange-wikileaks-and-roger) at 4.

Since then, journalists have continued to uncover links between the Mueller Report and this contempt proceeding, as well as facts about the underlying investigation itself.   In October 2020, for example, CNN published an article detailing a number of previously unknown facts about the underlying investigation, including that the secret witness was an "Egyptian state-owned bank." *See* Ex. 5 (Polantz, Perez & Herb) at 1, 3 (including, among other things, a statement from senior adviser Jason Miller that "President Trump has never received a penny from Egypt."); *see also* Ex. 12 (Adam Goldman & Michael S. Schmidt, *F.B.I. Once Investigated Trump Campaign Adviser's Ties to Egypt*, N.Y. Times (June 20, 2020), https://www.nytimes.com/2020/05/28/us/politics/mueller-walid-phares.html) at 1 (noting "[t]he F.B.I. and the special counsel's office investigated whether a former Trump campaign adviser

secretly worked for the Egyptian government to influence the incoming administration in the months before President Trump took office").  And earlier this month, the Post published its extensive investigation—based on dozens of interviews and a review of "thousands of pages of government records, including sealed court filings and exhibits"—that provides the most in-depth look yet at the government's Egypt investigation.  Ex. 1 (Davis & Leonnig) at 3.  The Post's reporting also connects that investigation to this contempt proceeding: recounting the day that "senior judges closed a part of the federal courthouse in D.C. to hide the identities of the parties in a hearing . . . involving a state-owned foreign corporation." *Id.*

As the Post has now reported, an organization linked to the Egyptian intelligence service withdrew $9,998,000 in cash from the National Bank of Egypt around the time the Trump campaign was "running low on funds." *Id.* at 1, 5–6.  The money—in $100 bills, stowed in two large bags—was then removed from the bank by two men associated with the account and their associates. *Id.* at 6; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 3 (noting that this reported withdrawal was also confirmed to *The New York Times* by a person briefed on the investigation). The Post reported that the discovery of these withdrawals by U.S. investigators, which occurred in early 2019, "intensified a secret criminal investigation" that "beg[a]n . . . with classified U.S. intelligence indicating that Egyptian President Abdel Fatah El-Sisi sought to give Trump $10 million to boost his 2016 presidential campaign."  Ex. 1 (Davis & Leonnig) at 1; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 4 (explaining that "in the eyes of some agents and prosecutors working on Mr. Mueller's team, the intelligence about Egypt was far firmer than anything they had related to Mr. Trump and Russia").

According to the Post and additional reporting from *The New York Times*, the Justice Department spent years—beginning shortly after the election in 2016—"examining whether

money moved from Cairo to Trump, potentially violating federal law that bans U.S. candidates from taking foreign funds." Ex. 1 (Davis & Leonnig) at 1; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 3.  Investigators also explored whether Trump's injection of $10 million of his own money into his campaign in October 2016 was linked to the cash withdrawal in Egypt.  Ex. 1 (Davis & Leonnig) at 1, 4.  One possibility, according to reporting by *The New York Times*, was that a Trump campaign adviser named Walid Phares "act[ed] as 'a bag man.'"  Ex. 3 (Schmidt, Goldman & Thrush) at 1; *see also id.* at 3 (noting the government expended "significant resources" investigating Mr. Phares, and identifying "potentially corroborating evidence" that the Egyptian government had doubted whether Phares could be trusted with the delivery).  The Post investigation also noted that during the Trump administration, United States' foreign policy toward Egypt shifted.  Ex. 1 (Davis & Leonnig) at 3 (reporting, *inter alia*, that the State Department "released $195 million in military aid [to Egypt] that the United States had been withholding over human rights abuses" and sent an additional $1.2 billion in such aid).

The Post's article includes never-before-reported details about the investigation's oversight and conclusion.  It describes the Trump administration's oversight of the "politically sensitive" investigation—including the involvement of then-Attorney General William Barr, *id.* at 9, which continued beyond the President's threats to fire the Special Counsel and the President "drawing a red line around his personal finances," Ex. 3 (Schmidt, Goldman & Thrush) at 4; *see also* Ex. 1 (Davis & Leonnig) at 4 ("Trump's attorney general did not order the case closed, according to multiple people with knowledge of the events, but his instructions to [the U.S. Attorney for the District of Columbia] and, later, his selections to replace her, helped steer it to that end.").  As the Post reported, investigators had "pressed" U.S. Attorney Jessie Liu to authorize a subpoena for President Trump's 2017 bank records in connection with the Egypt investigation, and while Liu

14

had "indicated she was open to a subpoena seeking a limited amount of additional Trump bank records" in June 2019, she later "expressed hesitancy" after speaking with Attorney General Barr. Ex. 1 (Davis & Leonnig) at 9; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 4 ("Some investigators wanted to continue digging, but Mr. Mueller stopped short of seeking the records from when Mr. Trump took office, leaving some investigators disappointed."). In January 2020, Liu was ordered to step down as U.S. Attorney, and was replaced first by one close ally of Barr's, then by another. Ex. 1 (Davis & Leonnig) at 11. On June 7, 2020, Michael Sherwin, the third and final U.S. Attorney for the District of Columbia to oversee the investigation, sent an email announcing the decision to "clos[e]" it. *Id.* at 11–12. According to the Post's reporting, neither Attorney General Merrick Garland nor the Biden-appointed U.S. Attorney for the District of Columbia were "briefed on the Egypt investigation in their first year in office." *Id.* at 12.

Representatives of the Egyptian government and former President Trump, as well as one of the former U.S. Attorneys involved in the investigation, all spoke to the Post, and their statements confirm not only the existence of the Egypt investigation but also that it is now closed. The director of the Egyptian government's Foreign Press Center "emphasized that the Justice Department had closed the investigation without charges." *Id.* at 2. A Trump spokesperson also confirmed the investigation, while claiming that "[n]one of the allegations or insinuations being reported on have any basis in fact." *Id.* And Sherwin told the Post that "[t]he case was closed without prejudice[,]" while defending his decisions and noting that a successor could have reopened the case if he or she wanted to. *Id.* at 3, 12. According to the Post, "[t]he Justice Department and the U.S. attorney's office in D.C. declined to answer detailed questions for this report," and a "Justice Department spokesman[] declined to comment on behalf of the former special counsel's office." *Id.* at 3, 5.

The Post's August 2024 reporting has prompted a new wave of interest in the Egypt investigation.  In early September 2024, citing the Post's reporting, members of the "House Oversight Committee released a letter . . . asking former president Donald Trump if he ever illegally received money from the government of Egypt, and whether money from Cairo played a role in a $10 million infusion into his 2016 run for president." Ex. 2 (Leonnig & Davis) at 1.  But as the Post has reported, the letter's signatories, as members of the congressional minority, lack subpoena power.  *Id.*  If former President Trump declines to comply with the letter's requests by the September 17 deadline, the signatories thus cannot compel a response, *id.*, despite the strong public interest in learning more about a past president's—and current presidential candidate's— possible ties to a foreign government.

## DISCUSSION

Public access to court records and proceedings serves many salutary ends.  When equipped with sufficient information, the press and public are able to serve as a vital check on the government, including courts and prosecutors.  *See, e.g., Robinson*, 935 F.2d 282, 287 (describing the public "as overseer of the criminal justice process"); *Metlife*, 865 F.3d at 665 (explaining that the right of public access "serves to 'safeguard against any attempt to employ our courts as instruments of persecution,' to promote the search for truth, and to assure 'confidence in . . . judicial remedies'" (quoting *Hubbard*, 650 F.2d at 315 n.79)); *Richmond Newspapers*, 448 U.S. at 592 (Brennan, J. concurring); *In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986) ("[P]ublic access . . . discourag[es] either the prosecutor or the court from engaging in arbitrary or wrongful conduct.").  And chief among the purposes served by public access is ensuring the legitimacy of—and public trust in—democratic institutions.  *See, e.g., In re Leopold*, 964 F.3d at 1127 ("[P]ublic access to judicial records . . . reflects the antipathy of a democratic country to the notion of 'secret law,' inaccessible to those who are governed by that law."); *Metlife*, 865 F.3d at

665 (explaining the right of access "is fundamental to a democratic state" (quoting *Hubbard*, 650 F.2d at 315 n.79)); *see also Robinson*, 935 F.2d at 288 (public access to criminal proceedings "enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system" (alteration in original) (quoting *Oregonian Pub.*, 920 F.2d at 1465 (9th Cir. 1990))).

Even in the grand jury context—"where privacy and secrecy are the norm[,]" *In re Grand Subpoena, Judith Miller*, 438 F.3d 1141, 1150 (D.C. Cir. 2006) (quoting *In re Sealed Case*, 199 F.3d 522, 526 (D.C. Cir. 2000))—secrecy is neither absolute nor unyielding. *See, e.g.*, LCrR 6.1. And, as relevant here, the D.C. Circuit recently reiterated that such secrecy can give way in at least three circumstances, *see In re Cheney*, 2024 WL 1739096, at *3, two of which are applicable here.

*First*, court records may be made public when they "can be redacted to excise any secret information." *Id.* This Court already applied that exception in *In re Grand Jury Subpoena No. 7409* when it granted in part the Reporters Committee's motion to unseal certain materials pursuant to Local Criminal Rule 6.1. Mem. Op. & Order at 5–6, 10 (Apr. 1, 2019), ECF No. 116. Specifically, the Court ordered briefs and transcripts to be released in redacted form while, at the same time, denying the Reporters Committee's request to identify the contemnor corporation at the heart of these contempt proceedings. *Id.* at 10–12. Prior to issuing that order, the Court had already, *sua sponte*, released a redacted version of the docket and six orders and memorandum opinions. *Id.* at 4–5. In granting the Reporters Committee's motion, the Court agreed with the Reporters Committee that Local Criminal Rule 6.1 mandated the release of the materials the Court ultimately ordered disclosed: "Local Criminal Rule 6.1 provides the Reporters Committee with access to the briefs and transcripts, with any matters occurring before the grand jury redacted." *Id.* at 10.

At the same time, the redactions ordered by the Court in 2019 were based, at least in part, on a consideration that no longer holds. Citing to the government's representation that its underlying investigation was "continuing robustly," the Court explained that "[r]edactions must *thus* be applied to maintain the secrecy of all matters occurring before a grand jury." *Id.* at 5 (emphasis added); *see also* Hr'g Tr. 10:21-11:1 ("[Y]ou would concede . . . that if it is an ongoing grand jury investigation that the redactions and the amount of information that can be publicly disclosed has to be measured against the needs of an ongoing grand jury investigation, correct?"). Now—far from "continuing robustly," *see* Hr'g Tr. 17:8–9—the contempt proceeding, any related grand jury proceedings, and the government's investigation have all ended. Given these developments, there is no longer any investigation that can be jeopardized nor any heightened need for secrecy. *Cf. In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*, 678 F. Supp. 3d 135, 145 (D.D.C. 2023) ("The Court certainly recognizes that where the special counsel's investigation is ongoing, the need for maintaining grand jury secrecy is only heightened." (cleaned up)).

And while those interests would be diminished in any case, they are especially diminished here, where the ongoing nature of the proceedings had the downstream consequence of greatly reducing (if not eliminating) the extent to which the Mueller Report detailed the Egypt investigation. The special counsel regulations require a special counsel to "provide . . . [a] report explaining the prosecution or declination decisions reached by the Special Counsel." *See* 28 C.F.R. § 600.8(c). And while such reports are "confidential" upon submission, *id.*, they often become public in practice. *See, e.g.,* Independent and Special Counsel Investigations, GovInfo, https://www.govinfo.gov/collection/independent-counsel-investigations. That is hardly surprising given the nature of special counsel investigations. They often implicate a president or other high-

ranking officials where public confidence is especially important. Such was the case here. Special Counsel Mueller authored a report, and most of it is now public. But as noted, the Egypt investigation was continuing robustly when he submitted the Report. Had that not been the case— had the Egypt investigation concluded before March 2019—information regarding the Egypt investigation would likely have already been disclosed alongside the publicly released portions of the Special Counsel report that detailed the Russia investigation. In other words, much would already be known about it given the circumstances surrounding the investigation. Accordingly, to the extent the "ongoing" or continuing nature of the proceedings necessitated increased redactions, that factor is no longer in play.

With the justifications for secrecy having subsided substantially over time, they should give way—particularly given the unique importance of transparency and accountability here. As the Post's reporting reflects, the Egypt investigation involved matters of grave national concern: a foreign nation's potential bribery of, and illegal campaign contributions to, a presidential candidate who became president and who is running for that office again, and the possibility that the Justice Department—under two administrations—failed to follow the evidence wherever it might lead. *Cf. Hubbard*, 650 F.2d at 323 (noting as an example of when "permitting public access" could "substantially serve[]" "the integrity of the law enforcement process," a circumstance in which "a governmental failure to prosecute in the light of overwhelming probable cause substantially impugns the integrity of the prosecutorial function").

Absent further disclosure, questions about the Egypt investigation undoubtedly will persist. And those questions are likely to be wide-ranging—*e.g.*, why was the investigation closed, was there sufficient evidence to continue, did the Department of Justice follow standard practice, why did a new administration leave it closed? In a democratic system that relies on transparency to

19

ensure its legitimacy, such deep uncertainty derived from ongoing secrecy threatens to erode public confidence in our institutions. Put simply, while "[p]eople in an open society do not demand infallibility from their institutions," "it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572; *see, e.g.*, *United States v. Harris*, 204 F. Supp. 3d 10, 15 (D.D.C. 2016) ("[P]ublic access . . . [can] in general stimulate public confidence in the criminal justice system" (quoting *United States v. Kravetz*, 706 F.3d 47, 57 (1st Cir. 2013))). And that threat is especially acute where, as here, the investigation involves a former president who is again pursing the nation's highest office. *Cf. In re Motions of Dow Jones & Co.*, 142 F.3d at 503 ("There also can be no doubt of the value of public scrutiny of assertions of executive privilege.").

*Second*, and relatedly, grand jury material, including in filings in ancillary matters like contempt proceedings, may be made public when the information at issue has become "sufficiently widely known." *In re Cheney*, 2024 WL 1739096, at *3 (quoting *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)). Although the public revelation of such information through "unnamed sources" alone may be insufficient to undercut its "character as Rule 6(e) material," *In re Motions of Dow Jones & Co.*, 142 F.3d at 505 (quoting *In re North*, 16 F.3d at 1245), disclosures by a "witness," a "witness's attorney," or by "prosecutors," as well as news reporting can be sufficient, *In re Cheney*, 2024 WL 1739096, at *3; *see also Robinson*, 935 F.2d at 291 (explaining, outside the grand jury context, that "[a]lthough evidence that the release of a plea agreement may threaten an ongoing criminal investigation . . . may well be sufficient to justify sealing a plea agreement," it is insufficient where the relevant information "was already within the public knowledge" due to reporting by the Post).

As detailed above, numerous facts have become widely known since the Court's April 1, 2019 order that significantly alter the calculus with respect to redaction of the material at issue here. Most notable is the Post's painstaking reporting, which was based on dozens of interviews and a detailed review of thousands of pages of government records. *Cf. In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006) (when information "now part of the public record[] reveals some grand jury matters, . . . we see little purpose in protecting the secrecy of grand jury proceedings that are no longer secret"). That reporting offers detailed insight into the investigation and this contempt proceeding, including the identity of the contemnor Corporation (the National Bank of Egypt) and the country that owns it (Egypt).

The Post's reporting also contains on-the-record statements about the investigation from the relevant parties. *See, e.g., In re Motions of Dow Jones & Co.*, 142 F.3d at 505. A spokesperson for former President Trump, Steven Cheung, told the Post that "[t]he investigation referenced"— *i.e.*, the investigation seeking to trace funds from an Egyptian bank to Trump—"found no wrongdoing and was closed." Ex. 1 (Davis & Leonnig) at 2. Michael Sherwin, a former Department of Justice employee, confirmed that he "made the . . . decision" to close the Egypt investigation and that he "stand[s] by it." *Id.* at 3. Indeed, in an interview with the Post, Sherwin explained that the case "was closed without prejudice," that "[a]nyone could have reopened the case the second [he] left th[e] office," and that members of the Biden administration could have reopened the probe. *Id.* at 12.

Finally, Ayman Walash, the director of the Egyptian government's Foreign Press Center, emphasized in an email to the Post that the Department of Justice had closed the investigation without bringing charges. *Id.* at 2. While Mr. Walash is not—or does not appear to be—a direct employee of the contemnor, the National Bank of Egypt, "[t]he contemnor in this case is a

corporation that is owned by a foreign sovereign," Hr'g Tr. 9:13-14, and Mr. Walash is an employee of that sovereign: Egypt.   Notably, one of the contemnor corporation's primary arguments in the contempt proceedings was that it enjoyed the sovereign immunity of the country that owns it.   Accordingly, Mr. Walash's confirmation of the investigation, as an employee of the Egyptian government, carries significant weight in much the same way an attorney's disclosure of a proceeding does.

These "disclosure[s], coupled with the [Post's] extensive reporting about th[is] dispute[], make[] it possible that the underlying . . . dispute[], or at least the aspects of [it] that have been publicly disclosed, are so widely known that they are no longer protected by Rule 6(e)."   *In re Cheney*, 2024 WL 1739096, at *4.   Indeed, because at least some of the material that is still redacted can "only . . . confirm[] to the public what [is] already validated by [] official source[s]," keeping such information under seal is neither necessary nor justified.   *Robinson*, 935 F.2d at 292.

* * *

The Post's reporting makes pellucid the public's fundamental interests here.   The grand jury and ancillary contempt proceedings in *In re Grand Jury Subpoena No. 7409* concerned potential foreign interference in an American presidential election and potential violations of federal law by a then-candidate and once-again candidate for the presidency, Trump, and raise serious questions regarding why an investigation that reportedly would have gone further "in any other case – even with far less compelling evidence" was closed.   Ex. 1 (Davis & Leonnig) at 10. Further unsealing of the records in *In re Grand Jury Subpoena No. 7409* would both provide the public with a more complete picture of these events and help assure the public that the government pursued and ultimately closed the Egypt investigation in an impartial manner.

## CONCLUSION

For the foregoing reasons, the Reporters Committee and the Post respectfully request an order further unsealing the records in *In re Grand Jury Subpoena No. 7409* pursuant to Local Criminal Rule 6.1.  Or, at a minimum, the Court, in conjunction with the government and the contemnor's counsel, Alston & Bird LLP, should remove redactions concealing (1) the name of the contemnor, (2) any material that was redacted to protect the identity of the contemnor corporation and its country of origin, and (3) any material redacted to conceal the existence and nature of the investigation.

September 12, 2024

Respectfully submitted,

/s/ _____

Bruce D. Brown (D.D.C. Bar No. 457317)
Katie Townsend (D.D.C. Bar No. 1026115)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
bbrown@rcfp.org
ktownsend@rcfp.org

Theodore J. Boutrous Jr. (D.D.C. Bar No. 420440)
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213.229.7000
Facsimile: 213.229.7520
TBoutrous@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
H. Chase Weidner (*pro hac vice* forthcoming)
Megan R. Murphy (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: 212.351.2454
Facsimile: 212.351.4035
LCrain@gibsondunn.com
CWeidner@gibsondunn.com
MMurphy2@gibsondunn.com

*Counsel for Applicants The Reporters Committee for*
*Freedom of the Press and The Washignton Post*