IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re:*<br><br>*Application of The Reporters Committee for Freedom of the Press and The Washington Post for an Order Further Unsealing the Orders, Briefs, Transcripts, Docket, Record, and Party Names in In re Grand Jury Subpoena No. 7409.* | Miscellaneous Action No. 1:24-mc-115-JEB<br><br>**Oral Argument Requested** |

**REPLY MEMORANDUM IN SUPPORT OF APPLICATION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE WASHINGTON POST FOR AN ORDER FURTHER UNSEALING THE ORDERS, BRIEFS, TRANSCRIPTS, DOCKET, RECORD, AND PARTY NAMES IN**
***IN RE GRAND JURY SUBPOENA NO. 7409***

The Washington Post and the Reporters Committee for Freedom of the Press ("Applicants") respectfully submit this reply in further support of their application ("Application," or "App.") for an order authorizing the further unsealing of the orders, briefs, transcripts, docket, record, and party names in the case captioned *In re Grand Jury Subpoena No. 7409*.

**PRELIMINARY STATEMENT**

In the wake of detailed reporting about a historically significant, closed investigation into a foreign nation's potential bribery of, and illegal campaign contributions to, a presidential candidate who then became president (and will be president again), Applicants sought to unseal information concerning that investigation that is now publicly and widely known. In response, the government has agreed to unseal any material redacted to conceal the fact of its investigation and its subsequent closure, effectively conceding that there is no longer any justification for those redactions. Government's Opposition to Application of The Reporters Committee for Freedom of the Press and The Washington Post ("Opp.") at 4, 7 ("The government can confirm that the investigation is closed."). But the government maintains that the nature of the investigation and the identity and country of origin of a state-owned bank ("Contemnor") that resisted compliance with a subpoena issued in that investigation should remain sealed. *See generally id.* The government's position is untenable and this Court should reject it.

The identity of the Contemnor and its country of origin should be unsealed. As the D.C. Circuit has repeatedly affirmed, there "come[s] a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). And a recently unsealed opinion of the Court, as well as the Post's reporting, have made the Contemnor's identity and country of origin widely known. That should end the analysis. None of the government's arguments—that the Contemnor prefers continued sealing, that no

1

spokesperson for the foreign bank has confirmed its identity as the Contemnor, and that general policy considerations support secrecy in the grand jury context—alters the reality of what is in the public domain. Simply put, whether the Contemnor's identity and country of origin are widely known does not turn on the Contemnor's wishes. And although the policy justifications for grand jury secrecy may be substantial, they are not implicated where, as here, there is no secrecy left to protect. *Id.* Finally, regardless of whether the bank has identified itself through its own spokespeople, a spokesperson for its owner—the Arab Republic of Egypt—has confirmed, on-the-record, that the investigation was closed, something he would know only if the investigation had implicated Egypt in the first place. Accordingly, the Contemnor's identity and country of origin should be unsealed under Federal Rule of Criminal Procedure 6(e) and Local Criminal Rule 6.1.

Information concerning the nature of the underlying investigation also should be unsealed. The Post's reporting—based on dozens of interviews and a review of thousands of pages of primary source documents—has made the investigation's nature widely known. Each of the government's arguments opposing unsealing is unavailing. First, while the government seeks to discount the significance of the Post's reporting by claiming that only "official sources" can make information sufficiently widely known, binding precedent is to the contrary. Second, and similarly, the government's argument that primary sources of publicly disclosed information must have a chain of custody also is foreclosed by binding precedent. Third, the government's unduly narrow characterization of certain disclosures ignores both their context and meaning; when the scope and import of the information that is now widely, publicly known is properly considered, the extent of the relevant disclosures is broader than the government admits. Finally, the government deems the closure of the investigation irrelevant. But that argument not only contravenes precedent making clear that "[t]he need for grand jury secrecy is reduced after the

grand jury has concluded its work," *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 600 (D.C. Cir. 2020), *vacated on other grounds sub nom. Dep't of Just. v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021), but also it overlooks how central the ongoing nature of the investigation was to then-Chief Judge Howell's earlier ruling. *See* App. at 18.

In sum, at present, there is no valid reason to keep the identity and country of the Contemnor or the nature of the underlying investigation under seal. At the same time, unsealing will serve the public's unquestionable interest in these documents and the investigation. Unsealing will empower the public to serve in its role "as overseer of the criminal justice process," *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991), help instill "public confidence in the system," *id.* at 288 (quoting *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Oregon*, 920 F.2d 1462, 1465 (9th Cir. 1990)), and allow the public to "accept" the government's actions, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). Given the grave questions raised by the Post's reporting, each of these benefits is especially valuable here. The Application should be granted.

## ARGUMENT

Courts may "unseal records containing matters occurring before a grand jury" if "the records can be redacted to excise any secret information" or the "matters have already been publicly disclosed." *In re Cheney*, No. 23-5071, 2024 WL 1739096, at *3 (D.C. Cir. Apr. 23, 2024) (citing *In re North*, 16 F.3d at 1244–1245). Although the public disclosure of information through "unnamed sources" alone may be insufficient to undercut its "character as Rule 6(e) material," *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 505 (D.C. Cir. 1998) (quoting *In re North*, 16 F.3d at 1245), disclosures by a "witness," a "witness's attorney," or by "prosecutors," as well as news reporting all can be sufficient, *In re Cheney*, 2024 WL 1739096, at *3; *see also*

3

*Robinson*, 935 F.2d at 291–92. Here, the remaining redacted information is already public and sufficiently "widely known" such that it should be unsealed. *In re North*, 16 F.3d at 1245.

  **1. The Contemnor's Identity & Country of Origin.** A previously sealed opinion this Court recently ordered released, coupled with the Post's detailed reporting, have made the identity of the Contemnor and its country of origin widely known. As a result, both have lost their character as Rule 6(e) material and should be unsealed. The government's arguments to the contrary lack merit.

  On June 14, 2024, this Court released an opinion that identifies the National Bank of Egypt as the Contemnor and Egypt as its country of origin. The opinion explains that Contemnor's counsel sought "confirmation . . . that it is permissible . . . to share the grand jury subpoena with other personnel at [redacted] who would be involved in collecting the documents requested, including personnel at [redacted] in [City A]." Mem. Op. (Sept. 19, 2018), ECF No. 139-1, Attachment A at 3. In a footnote, the opinion explains that City A is Cairo, Egypt. *Id.* at 3 n.3; App. at 10–11. Later, the opinion explains that "[redacted] cites no contrary authority co[redacted], relying instead on conclusory declarations by [redacted] own Country A in-house and retained counsel." Mem. Op. (Sept. 19, 2018), ECF No. 139-1, Attachment A at 20. One of those declarations is from Ashraf Shaaban, who is described in the opinion as "Mov[ant's] Group Legal Counsel." *Id.* A simple Google search identifies Mr. Shaaban as an employee of the National Bank of Egypt in 2018—*i.e.*, "in-house . . . counsel." In other words, the Contemnor's in-house counsel worked at the National Bank of Egypt—including at the relevant time in 2018— and personnel in Cairo would be partly responsible for collecting responsive documents. These Court filings, therefore, alone have publicly confirmed the Contemnor's identity and country. *Cf. In re North*, 16 F.3d at 1245 (citing inadvertent disclosure by a judge as an example of when

4

information can be sufficiently widely known such that "the cat is out of the bag" (citing and quoting *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990)).

The Post's reporting also identifies the National Bank of Egypt as the Contemnor and Egypt as its country of origin.[1]  Indeed, as the Post reported, the director of the Egyptian Foreign Press Center, Ayman Walash, "emphasized" in an email to the Post "that the Justice Department had closed the investigation without charges."  ECF 1-3, Ex. 1 at 3; *see* App. at 21–22.  Mr. Walash's confirmation of the investigation and its closure without charges underlines that the investigation implicated Egypt.  App. at 21–22.  The Post's reporting also expressly and repeatedly identifies the National Bank of Egypt as the Contemnor—often by reference to primary source documents such as court filings.  *See, e.g.*, ECF 1-3, Ex. 1 at 2, 7, 8; App. 12–16.  This "extensive reporting" coupled with Mr. Walash's email also has made the Contemnor's identity and country of origin "so widely known that they are no longer protected by Rule 6(e)."  *In re Cheney*, 2024 WL 1739096, at *4.  And because they are no longer secret, any redactions made to shield those facts should be lifted.  *See* Fed. R. Crim. P. 6(e)(6); LCrR 6.1.

In response, the government asserts that the Contemnor has asked for its "identity to remain secret," cites general policy concerns, and claims that a spokesperson for the Egyptian government is not a "current representative" of the Contemnor.  Opp. at 4, 7.  Each argument falls flat.

*a. The Contemnor's Preferences.*  As an initial matter, the Contemnor's position has not always been clear.  *See* Country A's Response to the Reporters Committee for Freedom of the Press's Mot. to Unseal at 1, No. 18-3071 (D.C. Cir. Jan. 16, 2019) (taking "no position" on the Reporters Committee's motion to unseal); *see also* Mem. Op. (Jan. 15, 2019), ECF No. 139-1,

---

[1] *The New York Times* and CNN have also reported that the investigation involved Egypt and an Egyptian-owned bank.  *See* ECF 1-3, Exs. 3, 5 (*The New York Times* and CNN articles).

5

Attachment B at 1 (noting "counsel's desire to make a public statement to clarify the identity of its client"). Nor have its actions necessarily aligned with its current stance. By going into contempt and provoking a court battle, the Contemnor willingly submitted to judicial proceedings, which, in contrast to grand jury proceedings, are "presumptively open." *In re Special Proc.*, 840 F. Supp. 2d 370, 378 (D.D.C. 2012) (collecting cases); *compare Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 219 n.9 (1979) ("Since the 17th century, grand jury proceedings have been closed to the public."), *with United States v. Index Newspapers LLC*, 766 F.3d 1072, 1089 (9th Cir. 2014) ("[W]hether [contempt] hearings have been open to the public has been largely dependent on the circumstances of each case."). Counsel for the Contemnor was also served with the Application several months ago, and it neither responded to Applicants nor proffered any argument in this proceeding that might support its purported preference. Contemnor is thus in a weaker position to claim any right to secrecy by dint of its own choices. But even if the Contemnor had always clearly sought to keep its identity hidden, and even if its decision to face contempt did not weaken its claim, the Contemnor's wishes are hardly dispositive. As the D.C. Circuit has explained, whether to unseal turns on whether the information is "widely known"—not whether any particular party wants it to be. *In re North*, 16 F.3d at 1245.

 b. *General Policy Concerns*. The government's concerns about secrecy, in general, are also no barrier to unsealing here for a similar reason. "The purpose in Rule 6(e) is to preserve secrecy," but "[i]formation widely known is not secret." *Id.* Accordingly, the policy justifications for secrecy in the grand jury context fall away where, as here, "there is no secrecy left to protect." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007).

 c. *No Statement by the Contemnor*. Finally, as to the government's assertion that no spokesperson for the Contemnor itself has spoken publicly, that argument is true only in the

6

narrowest sense (if at all). The Contemnor is an Egypt-owned bank—indeed, it argued all the way up to the Supreme Court that the Foreign Sovereign Immunities Act protected it from any contempt order at all. *See generally* Redacted Pet. for Writ of Cert., No. 18-948 (Jan. 3, 2019). Mr. Walash is a representative of Egypt. Although perhaps not a spokesperson for the bank itself, his statements are authoritative as the spokesperson for the bank's ultimate owner. And while the government claims that Mr. Walash revealed only the fact of the investigation and its closure, that is far too narrow a gloss on his statement. If Egypt were not implicated in the investigation, as the Post reported, Mr. Walash would have said so and, in any case, he would not have known whether the investigation was closed. Mr. Walash's statement therefore confirmed unequivocally the state-owned bank's country of origin—*i.e.*, Egypt.[2]

Together, the recently released opinion of the Court and the Post's reporting have made the identity of the Contemnor and its country of origin sufficiently widely known. Concomitantly, a major factor in then-Chief Judge Howell's earlier opinion regarding unsealing—that the investigation was ongoing—no longer holds. *See* Hr'g Tr. 10:21-11:1 (recording the court asking whether counsel for the Reporters Committee "would concede . . . that if it is an ongoing grand jury investigation that the redactions and the amount of information that can be publicly disclosed has to be measured against the needs of an ongoing grand jury investigation"), 17:8-13 (recording the government explaining that the investigation was "continuing robustly" and confirming that "this is a situation where the Court must evaluate the Reporters Committee request for unsealing in the context of a robust and ongoing grand jury investigation"). Although "continuing robustly" in 2019, the investigation is now closed, as both the Post's reporting and the government have

---

[2] On-the-record statements confirming the nature of the Egypt investigation made by the acting United States Attorney who closed it support this as well. *See infra* p. 12.

7

confirmed. As a result, both the Contemnor's identity and country of origin should be unsealed along with any information prophylactically redacted to protect either fact.

**2. *Information About the Nature of the Investigation.*** The Post's reporting also has made the fact of the underlying investigation, its nature, and its closure "widely known." *In re North*, 16 F.3d at 1245. Indeed, as a consequence, the government has now *agreed* to remove redactions meant to conceal the fact of the investigation or its closure. Opp. at 4, 7. The government maintains, however, that the *nature* of the underlying investigation should remain under seal. *See generally id.* The government is wrong.

As detailed in the Application, the Post's and other news outlets' reporting has provided detailed insight into the Egypt prong of the Special Counsel's investigation. App. at 11–16. The public now knows that the investigation was looking into reports "that Egyptian President Abdel Fatah El-Sisi sought to give [former President Donald J.] Trump $10 million to boost his 2016 presidential campaign," and whether "money from Sisi might have factored into Trump's decision in the final days of his run for the White House to inject his campaign with $10 million of his own money." *Id.* at 3–4. It also knows that in mid-2020, the then-acting United States Attorney for the District of Columbia closed the investigation due to what he viewed as insufficient evidence. *See id.* at 4, 15, 21. And although the Post's reporting relies in part on statements from individuals who asked not to be identified, *see* Opp. at 6-7, it is also based on on-the-record interviews and a review of "thousands of pages of government records, including sealed court filings and exhibits," App. at 13, as the government acknowledges, Opp. at 6.[3]

---

[3] *See, e.g.*, ECF 1-3, Ex. 1 at 2 ("which U.S. officials later described in sealed court filings"), 3 ("according to interviews with people familiar with the case as well as documents and contemporaneous notes of the investigation," "spokesman Steven Cheung said by email," "In his email, Walash also emphasized . . ."), 4 ("In an interview, Michael Sherwin," "This . . . account . . . is based on a review of thousands of pages of government records, including sealed court filings and exhibits. The Post also interviewed more than two dozen people with knowledge of the investigation. The individuals spoke on the condition of anonymity to discuss a sensitive probe that ended without criminal charges.

8

Faced with these many disclosures from credible and reliable sources, including on-the-record sources, the government attempts to draw lines around who can cause information to be widely known, impose a chain of custody requirement on primary sources before they can be found to have made information widely known, read the relevant disclosures unduly narrowly, and downplay the significance of the investigation's closure. These efforts come up short.

*a. The "Who."* To begin with the "who," the government appears to claim that nothing about the nature of the investigation should be unsealed because only statements by "official sources" can cause information to lose its character as Rule 6(e) material, and no official source has disclosed the nature of the investigation. Opp. at 8. Although the government does not define what it means by "official source[]," it appears to view the term as encompassing only current government employees, individuals who testified before a grand jury, and their agents. *See id.* at 6 ("The court must unseal only those matters that have been disclosed by prosecutors, witnesses, or their attorneys . . . ."), 6–7 (arguing that "the government has not confirmed or disclosed any of the facts reported by the Post"), 7 ("None of these named sources are *current* representatives of the government or Contemnor." (emphasis added)). But the binding case law is to the contrary.

The D.C. Circuit has never adopted the government's view that only "official sources" can cause information to become sufficiently widely known. True, courts will consider the sources of the information disclosed when determining whether it has lost its Rule 6(e) character. *In re New*

---

Some showed The Post emails, texts and other documents corroborating their accounts."), 6 ("according to FBI interview notes of a key Trump adviser," "according to previously unreported documents reviewed by The Post," "The bank records offered no evidence that Trump had taken money from Egypt, according to documents reviewed by The Post"), 7 ("The Post pieced together the court fight using records that were later released with redactions, other documents that remain secret, and interviews with people with knowledge of the case," "According to the bank records"), 8 ("read a . . . filing signed by Liu," "the bank on April 4, 2019, filed a statement from a bank manager"), 9 ("the bank's records showed"), 10 ("according to contemporaneous notes of the discussions," "the notes say," "according to the notes and people familiar with the case," "According to the notes," "according to the notes"), 12 ("The subject line of the email, which was reviewed by The Post"), 13 ("In an interview with The Post, Sherwin said").

9

*York Times Co.*, 657 F. Supp. 3d 136, 151 (D.D.C. 2023) (stating that "who makes the disclosures matters"), *vacated on other grounds sub nom. In re Cheney*, 2024 WL 1739096; *see* Opp. at 5-6. And courts also have considered a lack of attribution or other indicia of unreliability to be relevant to the analysis. *In re New York Times Co.*, 657 F. Supp. 3d at 152 (noting that Rule 6(e) yields in the face of "reliable, credible, and authoritative disclosures"). It is unsurprising, then, that courts are likely to find a public disclosure sufficient if a party, or its agent, makes the disclosure because it lessens any doubt as to whether the disclosure is reliable. But Circuit precedent does not direct that Rule 6(e) is overcome *only* in those circumstances, as the government argues here.

To the contrary, Circuit precedent indicates that information can become sufficiently widely known even if it is disclosed by a source other than the government or a party to a grand jury proceeding. App. at 20. In *In re North*, the court explained that "leaked material from the news media" cannot be "cram[med] . . . back into Grand Jury secrecy" in a context where "Rule 6(e) material was given currency among the extended community of persons named in the Report and ultimately became part of the media accounts, though not necessarily identified as grand-jury-related by that time." 16 F.3d at 1244–45 (cleaned up). In *In re Grand Jury Subpoena, Judith Miller*, the court explained that it was "unseal[ing] those portions [of Judge Tatel's opinion] containing grand jury matters that the special counsel confirmed in the indictment *or that have been widely reported*." 438 F.3d 1138, 1140 (D.C. Cir. 2006) (per curiam) (emphasis added). Then again in *In re Cheney*, the court explained that the government's disclosure, "coupled with the press's extensive reporting," made it "possible that the underlying privilege disputes, or at least the aspects of them that have been publicly disclosed, are so widely known that they are no longer protected by Rule 6(e)." 2024 WL 1739096, at *4. It thus follows that "reliable, credible, and authoritative disclosures," *In re New York Times Co.*, 657 F. Supp. 3d at 152, can come from a

variety of sources. And here, the sources—including reams of primary source documents and on-the-record statements by the acting United States Attorney who personally closed the investigation and spokesmen for two of its targets—have all the hallmarks of reliability, credibility, and authoritativeness.

The government's inconsistent positions in its brief only highlight the flaws in its argument while supporting Applicants'. The government claims that the individuals who spoke on the record to the Post only disclosed "that there was an investigation and that it was closed." Opp. at 7. And, accordingly, the government argues, only that information should be unsealed. *Id*. But the government also argues that none of those individuals is an "official source[]" because none is a "current representative[] of the government or Contemnor." *Id.* at 7–8. Thus, under the government's cramped definition of "official sources," all of the Post's sources were "unofficial" and necessarily could not be a source of information that became "widely known." The government can't have it both ways. If these "unofficial" sources who spoke to the Post—spokesmen for President-elect Trump and Egypt, both targets of the investigation, as well as the former government employee who closed the investigation at issue—could make *some* information sufficiently widely known, the government's contention that *only* "official sources" can do so is necessarily wrong.

b. *The Chain of Custody.* The government next argues that the Post's source material is inadequate because its reporting does not "reveal how those documents were obtained or who provided them." *Id.* at 7. Again, the government's argument does not square with binding precedent. *In re North* explains that although Rule 6(e) does not automatically relent "once a leak of Rule 6(e) material has occurred," there nevertheless "come[s] a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." 16 F.3d at 1245. In

11

other words, leaks can result in Rule 6(e) secrecy being lost. *See id.* The upshot is that although the origin of a disclosure may bear on its reliability, credibility, and authoritativeness—and thus anonymous comments to the press may not suffice in the Rule 6(e) analysis—*In re North* makes clear that the absence of a chain of custody is not dispositive. *In re Motions of Dow Jones* is in accord. There, the court stated that information did not become widely known simply because of "press reports relying on *unnamed* sources"—*i.e.*, people. *In re Motions of Dow Jones & Co.*, 142 F.3d at 505 (emphasis added). But it did not address the circumstance where, as here, reporting is based on identified and identifiable primary sources such as court filings, emails, and bank records—documents whose reliability and authenticity are unchallenged. The Court should reject the government's proposed chain-of-custody rule.[4]

    c. *Unduly Narrow Reading of the Disclosures.* The government next seeks to unreasonably narrow the scope of the disclosures at issue. Although the government is correct that courts are generally careful not to construe the scope of Rule 6(e) disclosures too broadly, Opp. at 6, the government's view of the substance of what has been disclosed is unduly thin. The government claims that the on-the-record interviews the Post reported on revealed only the fact that there was an investigation and that it is now closed. Opp. at 7. That's not true. Mr. Walash's

---

[4] *In re Cheney* cites *In re Motions of Dow Jones* for the proposition that "[a]nonymous leaks . . . do not strip Rule 6(e) protection from grand jury matters." 2024 WL 1739096, at *3 (citing *In re Motions of Dow Jones & Co.*, 142 F.3d at 505). But as just noted, *In re Motions of Down Jones* does not adopt any such blanket rule. And because *In re Cheney* is unpublished and therefore did not purport to break new ground, it is unlikely *In re Cheney* intended to announce as broad a bright-line rule as a plain reading of that text might suggest. *See* Circuit Rule 36(e)(2) ("[A] panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition."). Instead, it is simply citing *In re Motions of Dow Jones* for the same limited proposition noted above: that "[a]nonymous leaks"—*i.e.*, statements from unnamed persons—generally "do not strip Rule 6(e) protection from grand jury matters." 2024 WL 1739096, at *3 (citing *In re Motions of Dow Jones & Co.*, 142 F.3d at 505). This is reinforced by the content of the opinion being appealed in *In re Cheney. See In re New York Times Co.*, 657 F. Supp. 3d at 156–57 (articles "citing as their sources 'people familiar with' the matters" was insufficient to overcome Rule 6(e)). And in any event, a broad reading of the rule in *In re Cheney* would conflict with *In re North*, a result that could only follow when the court sits *en banc. See, e.g.*, *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("It is fixed law that this Court is bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court." (quotation marks omitted)). The Court should therefore be guided by *In re North* and *In re Motions of Dow Jones*.

12

statement makes clear that Egypt was implicated. *See supra* pp. 5, 7. And the statement by Steven Cheung, a spokesperson for President-elect Trump, is similar. Mr. Cheung told the Post that "[t]he investigation referenced"—the Egypt investigation—"found no wrongdoing and was closed." ECF 1-3, Ex. 1 at 3. Like Mr. Walash, Mr. Cheung would have no reason to know the investigation was closed unless President-elect Trump were implicated. By "proclaim[ing] from the rooftops that his client" was not charged in connection with the Egypt investigation, Mr. Cheung "reveal[ed] . . . to the public" the fact that the investigation concerned President-elect Trump. *In re Motions of Dow Jones*, 142 F.3d at 505.

The statements by former acting United States Attorney Michael Sherwin also convey more than the investigation's mere existence and closure. In a deeply reported article squarely focused on the Egypt investigation, Mr. Sherwin told the Post on the record that he "made the . . . decision" to close the Egypt investigation in light of what he viewed as insufficient evidence, that he "stand[s] by" his decision to close it, that "[t]he case was closed without prejudice," that "[a]nyone could have reopened the case the second [he] left th[e] office," and that members of the Biden administration could have reopened the probe. ECF 1-3, Ex. 1 at 4, 13; *see also id.* at 12–13 (citing Mr. Sherwin's email closing the "Egypt Investigation"). As noted above, *supra* pp. 10–11, these statements are highly reliable as a factual matter, notwithstanding the government's assertion that they are somehow not "official" enough because Mr. Sherwin has left the government. He was, after all, the very individual who closed the Egypt investigation. And to view his statements as disclosing only two discrete facts requires sticking one's head in the sand. Particularly when read in context, Mr. Sherwin's statements also confirm the nature of the Egypt investigation—not just that some investigation existed and was closed.

*d. Downplaying the Closure of the Investigation.* Finally, the government's claim that the closure of the investigation is irrelevant misses the mark. Opp. at 4 (citing *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019)). First and foremost, it ignores then-Chief Judge Howell's statements in 2019. Considering the government's representation that the underlying investigation was "continuing robustly," Judge Howell explained that she was obligated to "evaluate the . . . request for unsealing in the context of a robust and ongoing grand jury investigation." App. at 10; *see id.* at 18. In other words, the court stated in no uncertain terms that the ongoing nature of the investigation was relevant. *Id.* And with that consideration dropping out of the equation, the sealing analysis should change accordingly. *Id.* at 18.

To the extent the government is suggesting that *McKeever v. Barr* forecloses consideration of the status of an investigation, Opp. at 4, it is mistaken. *McKeever* was about courts' inherent authority to unseal grand jury material—something not at issue here. 920 F.3d at 843. *McKeever* thus "does not address Rule 6(e)(6)" or "the wide range of materials that result from grand jury proceedings." *In re New York Times Co.*, 657 F. Supp. 3d at 148. Indeed, the D.C. Circuit has stated post-*McKeever* that "[t]he need for grand jury secrecy is reduced after the grand jury has concluded its work." *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d at 600; *see also In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*, 678 F. Supp. 3d 135, 145 (D.D.C. 2023) ("The Court certainly recognizes that where the special counsel's investigation is ongoing, the need for maintaining grand jury secrecy is only heightened." (cleaned up)). Closure of the investigation thus remains a valid consideration, particularly given the unique circumstances here. *See* App. at 18–19 (explaining that much would likely be known already if the investigation had closed before the Special Counsel issued his report); *cf. In re North*, 16 F.3d at 1245 (recognizing the

14

Independent Counsel's "argument that the reporting requirement of the Independent Counsel statute works a *pro tanto* repealer of [Rule 6(e)] insofar as it would cover him is not . . . frivolous").

But even if the status of the investigation were irrelevant, the outcome should be the same. The key question before this Court is whether information is sufficiently "widely known" to the public to have lost its character as Rule 6(e) material. *In re North*, 16 F.3d at 1245. For the reasons above, the identity of the Contemnor, its country of origin, and the existence, nature, and closure of the investigation now are. The Application should therefore be granted.[5]

## CONCLUSION

For the foregoing reasons and those in the Application, Applicants respectfully request an order unsealing the records in *In re Grand Jury Subpoena No. 7409* concerning (1) the name of the Contemnor, (2) any material redacted to protect the identity of the Contemnor corporation and its country of origin, and (3) any material redacted to conceal the nature of the underlying investigation.

---

[5] The government appears to misunderstand Applicants' suggestion that filings could be released with further narrowed "redact[ions] to excise any secret information." Opp. at 3 (quoting App. at 17). It seems to believe that Applicants are simply asking for the documents at issue here to be reviewed anew without regard to subsequent developments. *See id.* That is incorrect. Circumstances have changed since 2019 and June 2024. App. at 21; *see also supra* p. 5 (identifying information brought to light by the Post's reporting). More has become publicly known about the Egypt investigation and, as a result, more can be unsealed in this proceeding. But to the extent any information must remain secret, that information can remain redacted while the now-widely-known information is publicly released. *See* App. at 17.

15

December 2, 2024

Respectfully submitted,

/s/    *Theodore J. Boutrous Jr.*
Theodore J. Boutrous Jr. (D.D.C. Bar No. 420440)
  *Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213.229.7000
Facsimile: 213.229.7520
TBoutrous@gibsondunn.com

Bruce D. Brown (D.D.C. Bar No. 457317)
Katie Townsend (D.D.C. Bar No. 1026115)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
bbrown@rcfp.org
ktownsend@rcfp.org

Lee R. Crain (D.D.C. Bar No. NY0337)
H. Chase Weidner (*pro hac vice*)
Megan R. Murphy (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: 212.351.2454
Facsimile: 212.351.4035
LCrain@gibsondunn.com
CWeidner@gibsondunn.com
MMurphy2@gibsondunn.com

*Counsel for Applicants The Reporters Committee for
Freedom of the Press and The Washington Post*