UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE WASHINGTON POST FOR AN ORDER FURTHER UNSEALING THE ORDERS, BRIEFS, TRANSCRIPTS, DOCKET, RECORD, AND PARTY NAMES IN IN RE GRAND JURY SUBPOENA NO. 7409 | Misc. Case No. 24-115 (JEB) |

## MEMORANDUM OPINION

When it comes to U.S. presidential elections, following the money can take one to unexpected destinations. Here, that gilded path leads, of all places, to Egypt — or so argue Applicants in this matter, the Reporters Committee for Freedom of the Press and *The Washington Post*. To confirm that hypothesis, they seek an order from this Court further unsealing documents in In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41 (D.D.C.), a civil-contempt proceeding against a foreign-owned corporation arising out of a federal grand-jury investigation into whether that corporation provided funds to Donald J. Trump during his 2016 presidential campaign. See ECF No. 1-1 (App.) at 1–4. While that investigation was ongoing, this Court's predecessor released some redacted documents in this matter *sua sponte* and others on a prior application from the Reporters Committee. See In re Grand Jury Subpoena No. 7409, 2019 WL 2169265, at *1–3 (D.D.C. April 1, 2019). Last June, this Court then trimmed some of the previous redactions. See In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, ECF No. 140 (Order) (D.D.C. June 20, 2024). The identity of the corporation, the

1

foreign state where it is located, and the details of the investigation, however, have remained under seal.

Now, with that grand-jury investigation closed and following reporting from the *Post* and other media that the contemnor corporation in question is the National Bank of Egypt, Applicants ask the Court for further unsealing of those documents to, at a minimum, reveal the identity of the corporation and nature of the investigation. See App. at 6. The Government opposes unsealing, noting that, despite the reporting, no party involved in the investigation has publicly confirmed anything other than that the investigation existed and now has been terminated. See ECF No. 16 (Opp.) at 5–8. While the question is a close one, the Court will largely deny the Application.

I.   **Background**

The following facts are drawn from the released portions of the redacted documents in this matter or have otherwise been made public.

   A.   Grand-Jury Investigation and Ancillary Proceedings

Although many Americans may be generally familiar with then-Special Counsel Robert Mueller's report on possible interference in the 2016 presidential election, see Sharon LaFraniere & Katie Benner, Mueller Delivers Report on Trump-Russia Investigation to Attorney General, N.Y. Times (Mar. 22, 2019), https://perma.cc/W546-PFY3, the full details of that investigation have not been made public. As relevant here, on July 11, 2018, a federal grand jury sitting in D.C. issued a subpoena in connection with that investigation seeking certain records from a "Corporation" from "Country A." In re Grand Jury Subpoena No. 7409, 2019 WL 2169265, at *1. Rather than comply, the corporation moved to quash the subpoena, arguing that it was immune from suit under the Foreign Sovereign Immunities Act and that compliance would be

2

"unreasonable or oppressive" under Federal Rule of Criminal Procedure 17(c)(2). See In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, ECF No. 139-1 at ECF p. 2 (Exh. A: Sept. 19, 2018, Mem. Op. at 1) (D.D.C. June 14, 2024).

Then-Chief Judge Beryl Howell denied that motion, ordering the corporation to produce the subpoenaed records by October 1, 2018. See id. at ECF p. 32. That Order sparked a lightning-fast trip through "all three levels of the federal judiciary." In re Grand Jury Subpoena No. 7409, 2019 WL 2169265, at *1. First, after the corporation refused to produce the pertinent records, the court held it in civil contempt and assessed a daily $50,000 fine against it until full compliance. See In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, ECF No. 30 (Order) at 6 (D.D.C. Oct. 5, 2018). The D.C. Circuit then affirmed the district court in a brief, unpublished decision, noting that its reasoning would be "explained more fully in an opinion to be filed at a later date." In re Grand Jury Subpoena, 749 F. App'x 1, 2 (D.C. Cir. 2018); see In re Grand Jury Subpoena, 912 F.3d 623 (D.C. Cir. 2019) (full opinion). Finally, in between those two opinions, the Supreme Court stayed the accrual of contempt sanctions, see In re Grand Jury Subpoena, No. 18A669 (U.S.) (Order of Dec. 23, 2018), before eventually lifting that stay, see id. (Order of Jan. 8, 2019), and denying the corporation's separate petition for certiorari. See In re Grand Jury Subpoena, 139 S. Ct. 1378, 1378 (2019).

B. Prior Unsealing, Press Reports, and Current Application

While the case was winding through the federal judiciary largely under seal, the press had picked up the scent. See In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, ECF No. 139-1 at ECF p. 34 (Exh. B: Jan. 15, 2019, Mem. Op. at 2). But reporters could initially glean only a few, bare details — namely, that a dispute over a grand-jury-related subpoena, possibly linked to Mueller's election-inference investigation, was underway in this district and the D.C.

3

Circuit. See, e.g., ECF No. 1-8 (Samuelsohn & Gerstein Article) at ECF pp. 2–5; Katelyn Polantz *et al.*, Mystery Mueller Mayhem at a Washington Court, CNN (Dec. 15, 2018), https://perma.cc/QQH3-5PKD. Judge Howell then released in January and February 2019 redacted versions of the docket sheet and six memorandum opinions and orders in the contempt matter. See In re Grand Jury Subpoena No. 7409, 2019 WL 2169265, at *1 nn.1–2. On application from the Reporters Committee, she subsequently released in April 2019 redacted versions of the briefs and transcripts, keeping hidden the identity of the contemnor corporation and many details of the investigation. See id. at *5–6. Then, several years later — and after the Government was asked whether it would further unseal any of the six opinions and orders previously released in redacted form, see In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, Minute Order of March 1, 2023 — the United States proposed, and this Court accepted, the republication of the documents with slightly fewer redactions. See In re Grand Jury Subpoena No. 7409, Grand Jury No. 18-41, ECF No. 140 (Order) (D.D.C. June 20, 2024). The files nonetheless keep secret the identity of the contemnor and the nature of the investigation. See id., ECF No. 139-1 (Attachments).

Even so, members of the media have constructed a fuller narrative about these proceedings. In October 2020, for instance, reporters from CNN wrote that the Special Counsel had been investigating "whether money flowing through an Egyptian state-owned bank could have backed millions of dollars Donald Trump donated to his own campaign days before he won the 2016 election." See ECF No. 1-7 (Polantz Article) at ECF p. 2. Citing a "dozen sources familiar with the effort," the article surmised that the subpoena and resulting contempt proceedings arose from that bank's efforts to avoid turning over records linking it to Trump's

4

$10 million contribution to his own campaign from his personal funds as the election approached. Id. at ECF pp. 2, 6.

Then, last August, the *Post* published a lengthy article identifying the bank as the National Bank of Egypt. See ECF No. 1-3 (Davis & Leonnig Article) at ECF p. 2. According to the paper, Egyptian President Abdel Fatah el-Sisi had withdrawn $10 million from the Egyptian intelligence service's account at the National Bank in order to donate that sum to Trump and thus curry favor with the potential future president. See id. at ECF pp. 2, 5. The *Post* reported that the grand-jury investigation into that transaction — and subsequent attempt to subpoena records from the National Bank — had prompted the civil-contempt proceedings described above. See id. at ECF pp. 6–8. According to a government lawyer who was overseeing the latter part of the investigation, the case was "closed without prejudice" in June 2020. See id. at ECF pp. 12–13.

Shortly after the article was published, this Application was filed. It seeks to unseal all publicly released documents in their entirety or, at a minimum, to remove redactions concealing the identity of the corporation and its foreign-state owner, as well as any material "redacted to conceal the existence and nature of the government's underlying investigation." App. at 6. Because the Chief Judge must "hear and determine all matters relating to proceedings before the grand jury," the Application was assigned to this Court. See LCvR 40.7(b). In addition to filing an Opposition, the Government has also filed an *ex parte* brief containing additional details about the information that remains redacted in the unsealed court records in this matter. See ECF No. 19 (*Ex Parte* Brief).

**II.     Legal Framework**

 A.  Grand-Jury Secrecy

In general, "the grand jury context presents an unusual setting where privacy and secrecy are the norm." In re Grand Subpoena, Judith Miller (Miller I), 438 F.3d 1141, 1150 (D.C. Cir. 2006) (quoting In re Sealed Case (Dow Jones II), 199 F.3d 522, 526 (D.C. Cir. 2000)). Witnesses "enter the grand jury room alone . . . . No judge presides and none is present." In re Motions of Dow Jones & Co. (Dow Jones I), 142 F.3d 496, 498 (D.C. Cir. 1998). Access to grand-jury materials turns on Federal Rule of Criminal Procedure 6(e)(2), which dictates that "[o]ther than witnesses, each person present . . . is forbidden from disclosing 'matters occurring before the grand jury.'" Id. (quoting Fed. R. Crim. P. 6(e)(2)); see also In re Sealed Case No. 99-3091, 192 F.3d 995, 1002 (D.C. Cir. 1999) (Rule 6(e) covers only "matters occurring before the grand jury"). In this Circuit, courts also lack any "inherent authority" to release matters occurring before the grand jury, outside certain enumerated exceptions. McKeever v. Barr, 920 F.3d 842, 844, 850 (D.C. Cir. 2019); see Rule 6(e)(3) (exceptions). This arrangement "safeguards vital interests," including "(1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." Id. at 844 (citing Douglas Oil Co. v. Petrol Stops Nw., 441 U.S. 211, 219 (1979)).

 B.  Accessing Ancillary Proceedings

The grand jury's business occasionally calls for "judicial proceedings relating to," but "at arm's length" from, the grand jury itself, including to resolve a witness's "motion to . . . quash [a] subpoena." Dow Jones I, 142 F.3d at 498. Records of such proceedings ancillary to the grand jury's work are not themselves subject to grand-jury secrecy but are instead governed by

Rule 6(e)(6), which requires that "[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal <u>to the extent and as long as necessary</u> to prevent the unauthorized disclosure of a matter occurring before a grand jury" (emphasis added).  Although Rule 6(e)(6) displaces any First Amendment or common-law right of access to documents in ancillary proceedings, see <u>Dow Jones I</u>, 142 F.3d at 500–04, the Rule allows for their release once sealing them is no longer "necessary" to protect grand-jury secrets.

In assessing the extent of such necessity, the Circuit has explained that Rule 6(e)(6)'s protection of "a matter occurring before a grand jury" encompasses "not only what has occurred and what is occurring, but also what is likely to occur" before that body.  <u>Id.</u> at 500.  The Rule therefore protects information in ancillary documents that reveals "'the identities of witnesses or jurors, the substance of testimony' as well as actual transcripts, 'the strategy or direction of the investigation, the deliberations or questions of jurors, and the like.'"  <u>Id.</u> (quoting <u>SEC v. Dresser Indus., Inc.</u>, 628 F.2d 1368, 1382 (D.C. Cir. 1980)).  Although Rule 6(e)(6) protection "does not create a type of secrecy which is waived" as soon as "public disclosure occurs," once "information is sufficiently widely known[,] . . . it has lost its character as Rule 6(e) material." <u>Id.</u> at 505 (quoting <u>In re North</u>, 16 F.3d 1234, 1245 (D.C. Cir. 1994)).  The Rule's secrecy requirements therefore yield only "when there is no secrecy left to protect."  <u>In re Grand Jury Subpoena, Judith Miller</u> (<u>Miller II</u>), 493 F.3d 152, 154 (D.C. Cir. 2007) (citation omitted).

    C.  <u>Local Rule 6.1</u>

While they cannot trump Federal Rules or binding caselaw, this Court's Local Criminal Rules set out a mechanism for releasing documents in ancillary proceedings.  Rule 6.1 provides that "[p]apers, orders and transcripts of hearings" in proceedings ancillary to the grand jury, "or portions thereof, may be made public by the Court on its own motion or on motion of any person

7

upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury." Once such a finding has been made, the Circuit has instructed that "where the Rules authorize [courts] to do so, [courts] may — and should — release any information so long as it does not reveal" material that Rule 6(e)(6) protects. In re Grand Jury Subpoena, No. 18-3071, Order at 1 (D.C. Cir. Apr. 23, 2019) (emphasis added). Prior to public release, the Chief Judge may also "redact[] documents." Dow Jones I, 142 F.3d at 501, 506 (describing Chief Judge's release of former President Clinton's motion seeking contempt order for violations of grand-jury secrecy); see, e.g., In re Grand Jury Subpoena No. 7409, 2019 WL 2169265, at *3, *5 (ordering release of redacted briefs and transcripts in this matter); Order and Unsealed Records, Grand Jury No. 18-41 (June 7, 2019), https://perma.cc/4K53-B3KL (displaying redacted filings, transcript, and court opinion for public viewing on court website).

### III.    Analysis

Encapsulating what was set forth above, this Circuit has summarized, "Courts may unseal records containing matters occurring before a grand jury only if the matters have already been publicly disclosed, one of the Rule 6(e)(3) exceptions applies, or the records can be redacted to excise any secret information." In re Cheney, 2024 WL 1739096, at *3 (D.C. Cir. Apr. 23, 2024) (citations omitted). Applicants do not argue that any of the Rule 6(e)(3) exceptions applies. Rather, they contend, first, that many of the existing redactions in the already released documents are no longer necessary because the grand-jury investigation has closed, see App. at 17–20; and second, that the information in question has in any event been publicly disclosed and become so "widely known" that it should lose its protection. Id. at 20 (quoting In re Cheney, 2024 WL 1739096, at *3). The Court will address each argument in turn.

8

A. Closure of Grand-Jury Investigation

It is no doubt true that, where possible, the Chief Judge should make grand-jury-related matters public "when they 'can be redacted to excise any secret information.'" Id. at 17 (quoting In re Cheney, 2024 WL 1739096, at *3); see Local Criminal Rule 6.1; In re Grand Jury Subpoena, No. 18-3071, Order at 1. In this case, however, such unsealing with redactions has already occurred, and Applicants do not seriously contend otherwise. Rather, they attempt to extrapolate from Rule 6.1 the additional principle that redactions in unsealed documents should be removed when they are "based, at least in part, on a consideration that no longer holds" — here, that the grand-jury investigation was ongoing. See App. at 18. The closure of that investigation, Applicants argue, "diminishe[s]" the interest in grand-jury secrecy, which should correspondingly "give way" to the interests in transparency and accountability. Id. at 18–19.

Even if Rule 6.1 extends to removing redactions, as the Government correctly retorts, "[T]he protections of Rule 6(e)(6) do not disappear at the close of an investigation." Opp. at ECF p. 4. Among the "vital interests" grand-jury secrecy preserves are "the willingness and candor of witnesses" and "the rights of a suspect who might later be exonerated." McKeever, 920 F.3d at 844; see Douglas Oil Co., 441 U.S. at 218–19. Neither of these interests is extinguished by the close of an investigation. Cf. In re Comm. on the Jud., U.S. House of Reps., 951 F.3d 589, 600 (D.C. Cir. 2020) (although "[t]he need for grand jury secrecy is reduced after the grand jury has concluded its work," "courts still must consider the possible effect upon the functioning of future grand juries") (cleaned up), vacated and remanded sub nom. DOJ v. House Comm. on the Jud., 142 S. Ct. 46 (2021) (citing United States v. Munsingwear, Inc., 340 U.S. 36 (1950)).

That the investigation here, moreover, concerned "matters of grave national concern," App. at 19, does not alter this calculus. Indeed, the Advisory Committee on Criminal Rules expressly declined in 2021 to add a Rule 6(e) exception for "materials of special historical or public interest" on the ground that such an exception might impede witness cooperation. See In re N.Y. Times Co., 657 F. Supp. 3d 136, 153 (D.D.C. 2023) (discussing rejection of proposal), vacated on other grounds sub nom. In re Cheney, 2024 WL 1739096. And sure enough, the contemnor corporation in question here has informed the Government that it wishes to keep its identity under wraps. See Opp. at ECF p. 4. Its cooperation with future grand-jury investigations — or that of any other witness — might be compromised if confidentiality could be swept aside whenever the topic of a closed investigation was deemed to be sufficiently newsworthy. Cf. N.Y. Times Co., 657 F. Supp. 3d at 152 (suggesting "ironic result" that heightened public interest may, in fact, call for more careful sealing of grand-jury matters).

All of which leads to the same conclusion: although the need for grand-jury secrecy may be "heighten[ed]" during an "ongoing" investigation, In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1138, 1141 (D.C. Cir. 2006), it by no means fully dissipates upon the investigation's conclusion. Applicants have presented no reason, apart from mere public interest, that would justify overriding that significant concern. See In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Procs. Concerning Former President Trump's Comms. with his Attorneys, 687 F. Supp. 3d 132, 140 (D.D.C. 2023) ("There is . . . no . . . right of access to documents in ancillary proceedings, regardless of how newsworthy and significant such proceedings may be.") (quotation marks omitted). The Court therefore will not do so.

B.  Spread of Information

Trying a different tack, Applicants assert that "there is no secrecy left to protect" anyway, Miller II, 493 F.3d at 154, because the identity of the contemnor corporation and the details of the investigation have become "sufficiently widely known." App. at 20 (quoting In re Cheney, 2024 WL 1739096, at *3).  To support this argument, they lean heavily on the *Post*'s "painstaking reporting" on the grand-jury investigation, coupled with both on-the-record comments from various individuals and Applicants' own deductions from portions of the documents that have already been released.  Id. at 21–22; ECF No. 20 (Reply) at 4–13.  For its part, the Government agrees that "the fact of an investigation" and its "closure" are matters of public record; to the extent that any of the current redactions reference such facts, it consents to their removal.  See Opp. at ECF p. 7.  But it resists unsealing any other details about the investigation, including the identity of the contemnor corporation or "Country A."  See id. at ECF pp. 5–9.

Insofar as Applicants suggest that media reporting alone is enough to destroy grand-jury secrecy, see, e.g., App. at 20–21; Reply at 3, they are mistaken.  It is well established that "press reports relying on unnamed sources" cannot strip away that secrecy.  Dow Jones I, 142 F.3d at 505; see also In re North, 16 F.3d at 1245 ("[W]hen the media reports information alleged to be grand jury material, the government is obligated to stand silent and not confirm the information, whether it is accurate or not.") (quotation marks omitted).  That is why, for example, Judge Howell twice rejected requests to unseal ancillary grand-jury material related to various investigations into former President Trump.  In both instances, the reporting that formed the basis for the unsealing requests had relied primarily on anonymous sources.  See N.Y. Times

11

Co., 657 F. Supp. 3d at 156–57; In re Press Application for Access to Jud. Recs. & Procs., 2023 WL 11158249 at *2–3 (D.D.C. Mar. 11, 2023).

Precedent in this Circuit thus counsels that "who makes the disclosure matters." N.Y. Times Co., 657 F. Supp. 3d at 151 (emphasis added). Grand-jury material may, for instance, become sufficiently widely known to merit unsealing when disclosed through a judicial proceeding or by a party with authoritative knowledge of the matter — *e.g.*, the government or a privilege-holder such as a witness or her attorney. See In re Cheney, 2024 WL 1739096, at *3; Miller II, 493 F.3d at 154–55 (releasing only those materials that were revealed "either during [a] trial or by grand jury witnesses themselves"); Dow Jones I, 142 F.3d at 505 (when witness's attorney "virtually proclaimed from the rooftops that his client had been subpoenaed," that fact "lost its character as Rule 6(e) material") (quotation marks omitted); In re North, 16 F.3d at 1245 (noting that, "when a judge in open court and in the presence of reporters . . . inadvertently state[s] the name of the as yet unindicted subject of a grand jury investigation," the "cat [may be] out of the bag") (quotation marks omitted). "Absent such reliable, credible, and authoritative disclosures of grand jury matters," however, "Rule 6(e) protections remain intact." N.Y. Times Co., 657 F. Supp. 3d at 152.

Acknowledging this precedent, Applicants nonetheless maintain that such authoritative disclosures have occurred here. They point to the following revelations: (1) a footnote in the redacted September 19, 2018, memorandum opinion in the contempt proceedings, which reveals that corporation personnel in Cairo, Egypt, would be involved in collecting documents for the subpoena; (2) that same opinion's identification of a person named "Ashraf Shaaban" as the "movant group's legal counsel," who Applicants claim (on the basis of a Google search) works at the National Bank of Egypt; and (3) statements to the *Post* by the director of Egypt's Foreign

12

Press Center, Trump's campaign manager, and a former government lawyer that the investigation has indeed been closed without charges. See App. at 21–22; Reply at 2–8 & n.3. According to Applicants, in the face of the breadcrumbs they have gathered from the redacted September 19 opinion, the aforementioned statements, and the obvious implications therefrom, it would require "sticking one's head in the sand" to avoid the conclusion that the grand-jury investigation involved the National Bank of Egypt's sending of funds to Trump. See Reply at 13.

The standard here, however, does not depend on the most likely inferences that may be drawn; indeed, it is not ultimately the job of this Court to connect the dots. See N.Y. Times Co., 657 F. Supp. 3d at 152 ("[R]elease of a judicial decision resolving an issue arising from a grand jury investigation in response to media requests predicated on general leaks may serve only to fill gaps in public reporting and thus violate Rule 6(e)(2)."). Readers of the *Post*'s reporting are free to form any conclusions they wish, yet they do so with the understanding that no party to the grand-jury investigation — not the Government, not the witnesses, not the target, and no representative of any foreign state or bank — has publicly disclosed the identity of the contemnor, the country where it is located, or the details of the investigation.

Forming an inference from a collection of clues, however suggestive they may be, is a far cry from, *e.g.*, a grand-jury witness's public admission of involvement on the "CBS Evening News." Miller II, 493 F.3d at 155; see also In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proceedings Concerning Former Vice President Mike Pence, 678 F. Supp. 3d 135, 142–43 (D.D.C. 2023) (permitting unsealing of court records related to former Vice President Pence's challenge to grand-jury subpoena after he had already "publicly acknowledged the facts underlying the privilege dispute") (quotation marks omitted). To point

13

out just one issue with Applicants' logic: even accepting their supposition that the corporation in question is an Egyptian state-owned bank — again, a claim that no relevant party has confirmed — there were several such banks operating in Egypt in the relevant period. See Tarek Roshdy Abdel Halem Gebba, Corporate Governance of Egyptian State-Owned Banks, 15 Int'l J. Applied Bus. & Econ. Rsch. 207, 219 (2017) (listing four state-owned commercial banks).

Nor is this situation like what our Circuit confronted in In re North, on which Applicants rely. See Reply at 10. There, the question was whether the court could, under Rule 6(e)(3)(C)'s exception permitting disclosure "in connection with a judicial proceeding," release the Final Report of the Independent Counsel investigating the Iran-Contra affair, notwithstanding that it contained grand-jury material. See In re North, 16 F.3d at 1244. That scandal had already produced "indictments of fourteen persons, four well publicized trials," id. at 1240, four interim reports released to Congress that included "most" of the Rule 6(e) material found in the Final Report, id. at 1244, and statements to the press by the Independent Counsel himself. See id. at 1241. After submitting the Final Report to the court, moreover, the Independent Counsel had sent it or portions of it to all persons mentioned, as required by statute. See id. at 1236. It was in that unique context that the panel observed that grand-jury secrecy "no longer exist[ed]" because "Rule 6(e) material was given currency among the extended community of persons named in the Report and ultimately became part of the media accounts, though not necessarily identified as grand-jury-related by that time." Id. at 1244–45.

No such sustained or repeated disclosure by the relevant parties has occurred here. Just the opposite, in fact. See Davis & Leonnig Article at ECF p. 3 ("A spokesman for Trump's presidential campaign did not answer a list of questions from The Post, instead referring to this story as 'textbook Fake News.'"); id. ("An Egyptian government spokesman declined to answer

14

detailed questions sent by The Post."); id. at ECF p. 4 ("The Justice Department and the U.S. attorney's office in D.C. declined to answer detailed questions for this report.  The FBI declined to answer The Post's questions or to make [FBI Director Christopher] Wray available to comment.  [Former Attorney General William] Barr also declined to answer detailed questions for this report, and [Former U.S. Attorney for D.C. Jessie] Liu did not respond to a similar inquiry.").  While some parties did comment briefly on the investigation, for its finer details — including, most critically, whom it involved — the *Post* relies exclusively on "multiple people with knowledge of the events" or "familiar with the matter."  E.g., id. at ECF p. 5.  "Those sources . . . are not the type of confirmation by government attorneys, grand jury witnesses, or a privilege holder that the Circuit has found sufficient to make secrecy no longer necessary."  N.Y. Times Co., 657 F. Supp. 3d at 157.

    This case is therefore most similar to In re Press Application for Access to Judicial Records, 687 F. Supp. 3d 132, which was a previous attempt to obtain evidence of a privilege dispute arising out of the grand-jury investigation into Trump's handling of classified documents.  There, as here, the press had pieced together a narrative (in that case, the surmised existence of a privilege dispute) from public documents and media reports based primarily on unidentified sources.  See id. at 137–38.  There, as here, Trump decried the reporting as false, and both the purported witness and the Government declined to comment.  Id. at 138.  And there, as it must here, the Court held that the press's inferences, however "plausible," did not constitute the type of public disclosure that has traditionally warranted lifting the veil of grand-jury secrecy.  Id.  As the Court explained, "'[T]here is likely to be a chilling effect on what a witness is willing to say to a grand jury . . . if there is a risk the court will later make the witness's

15

testimony public' based on the revelations of others." Id. at 140 (quoting McKeever, 920 F.3d at 849) (first alteration in original).

The Court today acknowledges the press's "diligent efforts to inform the public of the details surrounding these newsworthy events." Id. It nevertheless must respect the limits of Rule 6(e) as construed by the D.C. Circuit, which has circumscribed the types of sources whose public disclosures may vitiate the need for grand-jury secrecy.

### IV. Conclusion

For the foregoing reasons, the Court will deny the Application for Unsealing, except to the extent that existing redactions cover material that references only the existence or closure of the grand-jury investigation. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: January 14, 2025